IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

CAROLYN A. MOORE,                        §
                                         §
                   Plaintiff,            §
                                         § Civil Action No. 3:14-CV-3282-D
VS.                                      §
                                         §
CAPITAL ONE, N.A.,                       §
                                         §
                   Defendant.            §

MEMORANDUM OPINION
AND ORDER

Plaintiff Carolyn A. Moore ("Moore") brings this action against defendant Capital

One, N.A. ("Capital One"), alleging claims for race and age discrimination and retaliation

under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*; the

Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 *et seq.*; and the

Texas Commission on Human Rights Act ("TCHRA"),[1] Tex. Labor Code Ann. § 21.001 *et*

*seq.* (West 2015). Capital One moves for summary judgment. For the reasons that follow,

the court grants the motion and dismisses this action by judgment filed today.

---

[1]As the court noted in *King v. Enterprise Leasing Co. of DFW*, 2007 WL 2005541
(N.D. Tex. July 11, 2007) (Fitzwater, J.): "'Chapter 21 was entitled the Texas Commission
on Human Rights Act until the abolishment of the Commission on Human Rights. In 2004,
the 'powers and duties' of the Commission on Human Rights were transferred to the Texas
Workforce Commission Civil Rights Division.'" *Id.* at *1 n.1 (quoting *Tex. Dep't of
Criminal Justice v. Guard*, 2007 WL 1119572, at *2 n.3 (Tex. App. 2007, no pet.) (not
designated for publication)). As in *King*, the court for clarity will refer to these claims as
brought under the TCHRA.

In June 2006 Capital One hired Moore as a temporary Clerical Associate in its Distribution Center Department, also known as the Vault Department.[2] The following year, Vault Department Manager in Training, Seth Carillo ("Carillo"), hired Moore as a full-time, permanent Clerical Associate II. At the time Capital One hired Moore as a permanent employee, she was 47 years old.

The Vault Department maintains collateral files for Capital One Auto Finance and stores secure information and documentation relating to car and home loans. Associates in the Vault Department work on various processes that involve maintaining and organizing contract files and supporting documentation. Capital One expects associates in the Vault Department, including Moore, to maintain quality assurance ("QA") standards by limiting the percentage of errors they make while working a particular process. According to Capital One, each month, auditors in Capital One's Audit Department audit a sampling of processes completed by each associate. Errors are then categorized based on a level of risk (high, medium, or low) to Capital One's business and customers, and the associate's monthly QA average is decreased based on the number and risk alert level of any errors discovered by the QA auditor.

---

[2]In deciding Capital One's summary judgment motion, the court views the evidence in the light most favorable to Moore as the summary judgment nonmovant and draws all reasonable inferences in her favor. *See, e.g., Owens v. Mercedes-Benz USA, LLC*, 541 F.Supp.2d 869, 870 n.1 (N.D. Tex. 2008) (Fitzwater, C.J.) (citing *U.S. Bank Nat'l Ass'n v. Safeguard Ins. Co.*, 422 F.Supp.2d 698, 701 n.2 (N.D. Tex. 2006) (Fitzwater, J.)).

Capital One's "Vault Performance Expectations" document (which Capital One maintains was in effect when Moore's employment was terminated), states that "[q]uality must be higher than 98% for Monthly Average." D. App. 167. It then lists the following "Risk Alerts" in a rolling 90-day period: one risk alert—verbal warning; two risk alerts—written warning; three risk alerts—conduct memo; four risk alerts—termination. *Id.* Capital One maintains that an error must be discovered by the QA department in order for it to affect an associate's monthly QA score.

Although Moore received strong performance reviews from 2008 through 2011, Capital One maintains that, during Moore's annual reviews for these years (including in 2009 when Moore indicated to Carillo that she would like to "work on becoming a lead for the department," *id*. at 175), Carillo repeatedly counseled Moore about her need to improve in the areas of influence and communication. Capital One also contends that, during Moore's 2010 performance review, Carillo suggested that Moore join a Quality Circle[3] team in order to improve in the competencies of influence and communication. Rather than join a Quality Circle, Moore joined the I-Team, an organization that plans fun activities and rally events and recognizes associates' birthdays. During Moore's 2011 performance review, Carillo

---

[3]A Quality Circle is a group of associates who work together to create solutions to an issue relating to a process, complete a tracking document known as a "PDCA Action Plan," and then present their solution to management. The primary goal of a Quality Circle is to identify a process, learn how the process works, and then develop methods to improve the process. Capital One maintains that Quality Circles are used to develop associates' skill sets in certain areas relating to their job duties, including leadership and influence, and to help create solutions for working various processes in the Vault Department.

again recommended that Moore join a Quality Circle because it "would help her grow on how a process is built and show how to influence a team." *Id.* at 181. Moore never joined a Quality Circle.

On April 25, 2012 Senior Unit Manager Annette "Bre" Galvan ("Galvan") sent an email to all permanent associates in the Vault Department to gauge their interest in becoming a Team Lead.[4] At the time, Larisa Dzhavadova ("Dzhavadova") was the only Team Lead in the department, but Galvan and Carillo determined that another Team Lead was necessary to keep up with the growth and demands of the department. Moore responded to Galvan's email expressing interest in the position.

In June 2012 Carillo moved to a position outside of the Vault department and Jorge Cornejo ("Cornejo") replaced Carillo as Manager in Training. Maegan Stanaland ("Stanaland") replaced Galvan as Senior Unit Manager and served as Cornejo's immediate supervisor. In October 2012 Cornejo and Stanaland promoted Anthony Vogel ("Vogel"), a

---

[4]Capital One maintains that

> [a] Team Lead creates, maintains, and facilitates new hire training for the Vault team, completes internal QA audits of associates' work and provides documentation of the audits to management. A Team Lead must have a high level of systems knowledge and skills, such as outlook, excel, knowledge link, winocular, etc. and must have expert knowledge of the processes and systems within the Vault, as well as knowledge of the processes outside of the Vault that impact Capital One's customers. The Team Lead also needs to have exceptional communication, influence, and teamwork skills.

D. Br. 6 n.3.

27-year-old Caucasian, to the position of Team Lead. Moore contends that Dzhavadova provided Vogel the training to become a Team Lead and that he received the promotion based, in part, on his alleged romantic relationship with Dzhavadova.[5]

On Moore's 2012 annual performance review, which Capital One maintains Cornejo completed before December 20, 2012, Cornejo rated Moore as "inconsistent" on seven of nine competencies. Under "Development Opportunities," Cornejo noted:

> [Moore] has several opportunities in the areas of communication, teamwork and results focused. [She] does not communicate effectively with peers and supervisors. . . . She avoids addressing concerns with her team lead or asking for feedback. When asked to request written feedback from her team leads she said no because she felt that she would only received negative feedback. Her peers have expressed that she is at times non-responsive or unapproachable. In both, team meetings and events, she has shown to be disengaged by sitting away from the team instead of joining the group. When asked if [she] would be interested in volunteering to help another department, her response was that her peer should do it. She is not sought out by her team member[s] for input despite her tenure in the team.
>
> [Moore] is part of the QA pulling team but has received several errors in her overall QA score during the year. Often, she has also been found to fill out trackers improperly and move files . . . to the wrong location. Her production has also shown to be inconsistent and often does not meet her daily goal which in the past contributed to a backlog of files that needed to be reviewed.

Id. at 182. During her deposition, Moore admitted that her monthly QA scores for 2012 were unacceptable at various times.

_____

[5]Capital One contends that Team Leads are not managerial level positions and that Dzhavadova did not have the authority to hire, fire, promote, or discipline associates.

On January 28, 2013 Moore told Stanaland that she believed she was passed over for the Team Lead position given to Vogel because she was African-American and older. She also said that she felt Cornejo had harassed her in a recent meeting by responding to her in a harsh manner. Moore then contacted HR Specialist Debbie Sterling ("Sterling"), and, when they met on February 4, 2013, Moore told Sterling that she had been discriminated against by not being promoted to Team Lead; that Dzhavadova had refused to train her to become a Team Lead but trained Caucasian employees; and that Cornejo had retaliated against her by responding to her harshly during a meeting. Sterling conducted an investigation into Moore's complaints, but concluded that she could not substantiate any of Moore's claims for race and age discrimination, harassment, or retaliation and informed Moore of the results of her investigation on February 15, 2013.

On February 22, 2013 Moore filed with the Equal Employment Opportunity Commission ("EEOC") a charge of discrimination ("EEOC Charge"), alleging race and age discrimination and retaliation beginning on May 1, 2012. In the EEOC Charge, she alleged that she was denied training opportunities that her younger Caucasian counterparts were given to become Team Leads; she was passed over for a promotion to a Team Lead and the job was given to a younger Caucasian counterpart; and she was retaliated against after she reported the discrimination "earlier this year" by being "given a poor performance review a week later despite having no previous performance issues and receiving good performance

reviews."[6]  *Id.* at 222.

In November 2013 Melissa Gandara Whitley ("Gandara"), Manager in Training—Records Management, became Moore's immediate supervisor.  When Moore received the lowest QA score (98.33%) of all the associates in the Vault Department for the month of November, Gandara and Cornejo discussed Moore's risk alert/error with her in a "10/10" meeting.[7]  According to Capital One, Moore refused during the meeting to take ownership of the error and appeared to be frustrated and withdrawn.

In January 2014 Moore was advised that, in addition to the PF Checks and Release process she was already working on, she would begin working the Vault E-Mail Box process.  When Moore questioned the decision to assign her to the Vault E-Mail Box, Gandara explained that working the Vault E-Mail Box would be a good developmental opportunity for Moore.  Later that month, Gandara sent Moore an email providing her with the names of three Capital One Univeristy ("COU") courses that Gandara wanted Moore to complete to improve her written communication skills.  Moore failed to complete all three courses, despite Gandara's request that she do so.

---

[6]In April 2014 the EEOC dismissed Moore's EEOC Charge and issued her a right-to-sue letter.

[7]"10/10" meetings are regular meetings in which associates meet individually with their supervisor to discuss their performance.  During a "10/10" meeting, the associate is given 10 minutes to talk about her employment with the manager, and, afterward, the manager is given 10 minutes to discuss the associate's performance.  Capital One maintains that the purpose of "10/10" meetings is to provide routine, constructive feedback to associates about their performance on a regular basis.

In Moore's 2013 performance review, Gandara noted the areas in which she felt Moore needed improvement:

> [o]ne of [Moore]'s opportunities is communication. . . . She has shown to have grammar, punctuation, and spelling errors in her writing. . . . During verbal communication, [Moore] often rolls her eyes if she does not agree with an idea and sometimes has difficulty creating two-way dialogue. [Moore] has difficulty with taking direction from her team lead and does not assume positive intent. She does not seek feedback and when it is given she is reluctant to admit mistakes. Many times [Moore]'s response to a question is "I don't know," and does not make an effort to investigate or provide a reasonable solution. [Moore]'s job specific skills are also an area of opportunity. She has little knowledge of MS office which is necessary for many tasks that would be needed for her to grow in the department. She requires a lot of guidance when working with Excel, while preparing and pulling sheets and more recently has shown similar errors while working with mailboxes in Outlook.

*Id.* at 184. Gandara also noted Moore's "desire to become a formal leader in the department," and stated her belief that Moore could "move forward in the right direction" by being receptive to feedback and by leveraging Capital One's educational resources (including its COU resources) to improve her written communication, verbal communication, and computer skills. *Id.* Capital One contends that, when Moore met with Gandara, Cornejo and Kelly Russell ("Russell"), a Department Operations Manager, to review her 2013 performance review, Moore exhibited "unprofessional and combative behavior" by, for example, telling Gandara that she should fix the grammatical errors in Moore's performance review before attempting to criticize Moore about grammatical mistakes. D. Br. 13.

On February 27, 2014 Moore was issued a "Conduct Memo for Being Disrespectful

to Co-workers," ("Conduct Memo"). D. App. 275. According to the Conduct Memo, Moore "ha[d] recently demonstrated concerning behavior by becoming argumentative, disruptive and unprofessional when communicating with her co-workers and managers," and the memo detailed four examples of this behavior. The Conduct Memo concluded:

> [t]his Conduct Memo serves as a final warning. Though this Conduct Memo will be active for a period of 90 days, should [Moore] violate these expectations, or any other policy or procedure of Capital One, either during or after this memo timeframe, she could be subject to additional disciplinary action up to and including immediate termination of employment for cause.

*Id.* at 276.

Moore's overall QA score for April 2014 was 86.67%—the lowest QA score of any associate in the department. As of April 30, 2014, Moore's year-to-date QA average was 95%, and her 12 month QA average was 97.5%, which was below Capital One's 98% quality standard expectation. Accordingly, on May 12, 2014 Gandara and Unit Manager Charles Christopher Craig ("Craig") issued a Performance Improvement Plan ("PIP") that required Moore to maintain a monthly 98% QA average for the next 90 days. As part of the PIP, Moore was required to submit "an action plan within the next five days that will demonstrate the actions needed for immediate and sustained improvement." *Id.* at 345. Capital One maintains that, during the meeting with Gandara and Craig, Moore stated that she felt she was being "harassed" and accused her managers of trying to push her out of the company.

Following the meeting, Gandara emailed Sharon Wood ("Wood"), who was employed in Associate Relations, Human Resources, with a copy to Craig, a recap of the meeting,

-9-

including Moore's statement that she was being "harassed." Wood directed Craig to follow up with Moore to find out why she felt harassed. Craig met with Moore on May 13, 2014. During the meeting, Craig discussed the 98% QA expectations for Moore's position, but Moore claimed the standard was unrealistic. Moore advised Craig that she felt harassed because her work was being "tampered with" after she reported discrimination. *Id.* at 122. Craig encouraged Moore to come talk to him or to contact Associate Relations if she felt that something impeded her progress.

The following day, Gandara met with Moore and provided her with a copy of Capital One's Vault Performance Expectations document. Gandara also made several suggestions of ways Moore could improve her performance. According to Capital One, Moore was unresponsive to Gandara's suggestions and refused to take ownership of her performance, again claiming that Capital One's 98% QA expectation was too high. Capitol One maintains that, in an "effort to ensure Moore is successful in her process," Gandara decided to remove Moore from working the Vault E-Mail Box. *Id.* at 434.

Moore submitted an action plan, as the PIP required. According to Capital One, the action plan Moore submitted was very broad and failed to identify any specific actions she planned to take to improve her performance. At the suggestion of Wood, Gandara asked Moore to expand her action plan to include specific steps she intended to take to improve her performance. In her revised action plan, under "Associate Comments," Moore stated, "[b]ecause of factors surrounding my [QA], production and other factors, I don't agree with having to take the measure of writing a PIP. I feel this is an attack against me. My job has

been threaten[ed] because of it." *Id.* at 355.

On May 21, 2014 Gandara emailed Moore and asked her to review the unidentified queue because Dzhavadova had found several errors in Moore's work. According to Capital One, instead of immediately seizing the opportunity to correct her errors, Moore questioned whether her daily production would be affected if she took the time to identify and correct the errors. Gandara then discussed the issue in person, but, according to Capital One, Moore became very combative, raised her voice at Gandara, and accused Gandara of harassing her because Gandara would not identify the errors for Moore. On May 27, 2014, when Gandara asked whether Moore was using any of the techniques or suggestions Gandara had discussed with her on May 14, 2014, Moore responded that she was not using any of the techniques or suggestions because she felt the way she already did it was fine.

The following week, QA Auditor Whitney Tingdale ("Tingdale") found two high risk errors that Moore had made in the queue. Moore's overall QA score for May 2014 was 93.33%, which was the lowest QA score in the entire department. Moore's May 2014 QA score failed to comply with the terms of her PIP, which required Moore to maintain a 98% monthly QA average for May.

Capitol One maintains that, as a result of Moore's increasingly combative and defiant behavior, her accumulation of four high risk alerts with a 90-day period, and her failure to comply with the terms and conditions of her PIP, Gandara and Craig decided to terminate her employment. Accordingly, on June 3, 2014, Capital One terminated Moore's employment for unsatisfactory performance and having a poor attitude. Capital One maintains that, at the

time Gandara and Craig decided to terminate Moore's employment, they were unaware that she had made complaints of discrimination, harassment, and retaliation with Capital One in January 2013 and were unaware that she had filed a charge of discrimination with the EEOC in February 2013.

After the EEOC dismissed Moore's EEOC Charge and issued her a right-to-sue letter, Moore sued Capital One in state court, alleging claims for discrimination and retaliation under the TCHRA, Title VII, and the ADEA based on Capital One's denying her training opportunities, denying her a promotion, giving her a poor performance review, and terminating her employment. Capital One removed the case to this court and now seeks summary judgment. Moore opposes Capital One's motion.

## II

As a threshold matter, the court notes that Moore has failed to comply with certain procedural requirements of this court's local summary judgment rules. N.D. Tex. Civ. R. 56.6(a) provides that summary judgment materials must be included in an appendix. Rule 56.6(b)(3) requires that "[e]ach page of the appendix must be numbered legibly in the lower, right-hand corner. The first page must be numbered as '1,' and succeeding pages must be numbered sequentially through the last page of the entire appendix." Instead of a properly-paginated single appendix, Moore has filed three individual appendix "Exhibits," each of which is separately numbered. Additionally, Moore has failed to comply with Rule 56.5(c), which provides that "[w]hen citing materials in the record, as required by Fed. R. Civ. P. 56(c)(1)(A) or (B), a party must support each assertion by citing each relevant page of its

own or the opposing party's appendix." Instead, Moore's brief cites generally to her affidavit and the affidavits of two coworkers, without pinpoint citations. *See, e.g.,* P. Br. 7 (citing, for proposition that Moore "possessed these qualifications moreso than Anthony Vogel, the person who was given the job sought by Plaintiff," "Affidavits of Moore, Smith and Shaver"). Despite these procedural errors, because the three affidavits on which Moore relies are relatively short, the court will consider them in deciding Capital One's motion for summary judgment.

Additionally, Moore's brief does not contain a statement of facts. The court therefore draws its recitation of the facts from Moore's complaint, Capital One's apparently uncontested statement of facts contained in its summary judgment brief, and the factual allegations contained in Moore's summary judgment response brief (insofar as they are supported by evidence contained in Moore's appendix).

III

Because Moore will bear the burden of proof at trial on her claims for discrimination and retaliation under the ADEA, Title VII, and the TCHRA, Capital One can meet its summary judgment obligation by pointing to the absence of admissible evidence to support Moore's claims. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once Capital One does so, Moore must go beyond her pleadings and designate specific facts demonstrating that there is a genuine issue for trial. *See id.* at 324; *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam). An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 248 (1986).  The nonmovant's failure to produce proof as to any essential element renders all other facts immaterial.  *See TruGreen Landcare, L.L.C. v. Scott*, 512 F.Supp.2d 613, 623 (N.D. Tex. 2007 ) (Fitzwater, J.).  Summary judgment is mandatory where the nonmovant fails to meet this burden.  *Little*, 37 F.3d at 1076.

IV

The court will consider together Moore's age discrimination claim under the ADEA and her race discrimination claim under Title VII and the TCHRA.  The familiar *McDonnell Douglas*[8] burden-shifting framework applies to all three claims.[9]

It is unlawful under the ADEA and the TCHRA "to discharge any individual or otherwise discriminate against any individual . . . because of such individual's age."  29 U.S.C. § 623(a)(1); *see also Tex. Labor Code Ann.* § 21.051(1) (West 2015) (making it an unlawful employment practice to discharge or discriminate against an individual because of age.).  Title VII and the TCHRA make it unlawful for an employer to discriminate against an employee on the basis of her race.  *See* 42 U.S.C. § 2000e-2(a)(1); *Tex. Labor Code Ann.*

---

[8]*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

[9]In *Gross v. FBL Financial Services, Inc.*, 557 U.S. 167 (2009), the Supreme Court noted that it "has not definitively decided whether the evidentiary framework of *McDonnell Douglas* . . . is appropriate in the ADEA context."  *Id*. at 175 n.2.  The Court relied instead on a textual analysis of the ADEA to resolve the question whether a plaintiff can succeed on a "mixed-motives" claim of age discrimination.  *Id.* at 175-77.  Absent Supreme Court authority, the court will follow the Fifth Circuit's post-*Gross* precedent and apply *McDonnell Douglas* to ADEA cases.  *See, e.g., Smith v. Bd. of Supervisors of S. Univ.*, 656 Fed. Appx. 30, 34 (5th Cir. 2016) (per curiam) ("Claims for age discrimination under the ADEA are also evaluated under the *McDonnell Douglas* framework." (citation omitted)).

§ 21.051(1).  To prove her age and race discrimination claims, Moore can rely on direct or circumstantial evidence.  *See, e.g., Flanner v. Chase Inv. Servs. Corp.*, 600 Fed. Appx. 914, 917 (5th Cir. 2015) (per curiam) (ADEA claim); *Dailey v. Whitehorn*, 539 Fed. Appx. 409, 411 (5th Cir. 2013) (per curiam) (Title VII claim).  If Moore relies on circumstantial evidence, her claim is analyzed under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See, e.g., Reynolds v. Sovran Acquisitions, L.P.*, 650 Fed. Appx. 178, 180 (5th Cir. 2016) (Title VII and ADEA claims); *Reed v. Neopost USA, Inc.*, 701 F.3d 434, 439 (5th Cir. 2012) ("Where, as here, a plaintiff relies on circumstantial evidence, Texas courts apply the familiar *McDonnell Douglas* burden-shifting framework to [discrimination] claims under the TCHRA.").  This framework consists of three stages.

First, Moore must establish a prima facie case of discrimination, which "creates a presumption that [Capital One] unlawfully discriminated against [her]." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981).  Moore may establish a prima facie case for discrimination based on her race and age by showing: "(1) she is a member of a protected class, (2) was qualified for the position, (3) was subjected to an adverse employment action, and (4) was treated less favorably than similarly-situated employees who are not members of her protected class." *Munoz v. Seton Healthcare, Inc.*, 557 Fed. Appx. 314, 320 (5th Cir. 2014) (per curiam) (citing *Wesley v. Gen. Drivers, Warehousemen & Helpers Local 745*, 600 F.3d 211, 213 (5th Cir. 2011)) (addressing claims under Title VII and ADEA).

Second, the burden shifts to Capital One to articulate a legitimate, nondiscriminatory

reason for the employment action taken against Moore.  *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506-07 (1993).  Capital One's burden is one of production, not proof, and involves no credibility assessments.  *See, e.g., West v. Nabors Drilling USA, Inc.*, 330 F.3d 379, 385 (5th Cir. 2003).  This "burden requires the production of admissible evidence in support of its nondiscriminatory reasons."  *Hervey v. Miss. Dep't of Educ.*, 404 Fed. Appx. 865, 868 (5th Cir. 2010) (per curiam) (citing *Burdine*, 450 U.S. at 255).

Third, once Capital One has produced evidence of a legitimate, nondiscriminatory reason for the adverse employment action, "the presumption of discrimination created by [Moore's] prima facie case disappears," *Machinchick v. PB Power, Inc.*, 398 F.3d 345, 350 (5th Cir. 2005), and "the burden shifts back to [Moore] to make an ultimate showing of intentional discrimination," *Campbell v. Zayo Grp.*, LLC, 2015 WL 3903539, at *3 (N.D. Tex. June 25, 2015) (Fitzwater, J.) (quoting *Reed*, 701 F.3d at 439); *see also Reeves v. Sanderson Plumbing Prods., Inc*., 530 U.S. 133, 143 (2000).  For her title VII and TCHRA claims, Moore must prove either that (1) "[Capital One's] proffered reason is not true but is instead a pretext for discrimination" (pretext analysis) or (2) "[Capital One's] reason, while true, is not the only reason for its conduct, and another 'motivating factor' is [Moore's] protected characteristic" (mixed-motive analysis).  *Alvarado v. Tex. Rangers*, 492 F.3d 605, 611 (5th Cir. 2007) (citing *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004)) (Title VII claim); *Reed*, 701 F.3d at 439-40 (TCHRA claim).  For her ADEA claim, however, Moore must prove either that (1) "[Capital One's] proffered reason was not true—but was instead a pretext for age discrimination" (pretext analysis) or (2) "even if [Capital One's]

-16-

reason is true, [she] was terminated because of [her] age" ("but for" analysis). *Flanner*, 600

Fed. Appx. at 918 (footnotes and internal quotation marks omitted). Under the ADEA, "a

reason cannot be proved to be 'a pretext *for discrimination*' unless it is shown both that the

reason was false, and that discrimination was the real reason." *Id.* (quoting *St. Mary's Honor*

*Ctr.*, 509 U.S. at 515). In other words, the causation standard under the third stage of

*McDonnell Douglas* differs for ADEA claims, on the one hand, and Title VII and TCHRA

claims, on the other hand, because, under Title VII and the TCHRA, Moore need only prove

that her race (or age, for her TCHRA age discrimination claim) was a motivating factor in

the employment decision, but, under the ADEA, she must prove that her age was the "but

for" cause (the reason) for the employment decision. *See Reynolds*, 650 Fed. Appx. at 181

n.4 ("The plaintiff's burden of proof under the third stage of *McDonnell Douglas* is thus

higher for ADEA claims than for Title VII claims. For an ADEA claim, the plaintiff must

demonstrate that age was a but-for cause of the adverse employment action. For a Title VII

claim, in contrast, the plaintiff need demonstrate only that sex was a motivating factor.");

*Reed*, 701 F.3d at 440 ("Under the ADEA, a plaintiff must prove that age was the 'but for'

cause of the challenged adverse employment action. Under the TCHRA, however, a plaintiff

need only show that age was a 'motivating factor' in the defendant's decision" (citations

omitted)). At the summary judgment stage, of course, Moore is only obligated to raise a

genuine issue of material fact regarding pretext. *See, e.g., Jackson v. Fed. Express Corp.*,

2006 WL 680471, at *6 (N.D. Tex. Mar. 14, 2006) (Fitzwater, J.) ("Because [defendant] has

satisfied its burden to produce a legitimate, nondiscriminatory reason for [plaintiff's]

discharge, in order for [plaintiff] to survive summary judgment, [s]he must create a genuine and material fact issue regarding the ultimate question of discrimination.").

"Although intermediate evidentiary burdens shift back and forth under this framework, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Reeves*, 530 U.S. at 143 (alteration in original) (quoting *Burdine*, 450 U.S. at 253).

V

The court begins with Moore's claims for age and race discrimination based on the denial of training opportunities.

A

Capital One moves for summary judgment on this claim, contending, *inter alia*, that denying training opportunities does not constitute an adverse employment action as is required for Moore's prima facie case of age and race discrimination. To establish a discrimination claim under Title VII, the ADEA, or the TCHRA, "a plaintiff must prove that he or she was subject to an 'adverse employment action'—a judicially-coined term referring to an employment decision that affects the terms and conditions of employment." *Thompson v. City of Waco, Tex.*, 764 F.3d 500, 503 (5th Cir. 2014) (citing *Pegram v. Honeywell, Inc.*, 361 F.3d 272, 281-82 (5th Cir. 2004)) (Title VII claim). "[A]dverse employment actions consist of 'ultimate employment decisions' such as hiring, firing, demoting, promoting, granting leave, and compensating." *Id.* (citing *Alvarado*, 492 F.3d at 612; *McCoy v. City of Shreveport*, 492 F.3d 551, 560 (5th Cir. 2007); *Pegram*, 361 F.3d at 282). "[A]n

employment action that 'does not affect job duties, compensation, or benefits' is not an adverse employment action." *Pegram*, 361 F.3d at 282 (quoting *Banks v. E. Baton Rouge Parish Sch. Bd.*, 320 F.3d 570, 575 (5th Cir. 2003)).

Capital One contends that failing to provide Moore with training cannot be the underlying basis for her discrimination claim because she lacks evidence that Capital One failed to provide her with the training necessary to become a Team Lead, and, moreover, the denial of training opportunities does not constitute an adverse employment action as a matter of law. Moore responds that, in her case, the denial of training "in fact result[ed] in the denial of an actual promotion," and, therefore, that "the failure to train is actionable." P. Br. 8-9.

## B

To the extent Moore intends to assert a separate discrimination claim based on the denial of training opportunities,[10] Capitol One is entitled to summary judgment dismissing this claim. This is so because the Fifth Circuit has consistently refused to hold that a denial of training constitutes an adverse employment action. *See, e.g., Roberson v. Game Stop/Babbage's*, 152 Fed Appx. 356, 361 (5th Cir. 2005) (per curiam) (holding that denial of computer training was not adverse employment action); *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 407 (5th Cir. 1999) (holding that denial of computer training was not adverse employment action); *Dollis v. Rubin*, 77 F.3d 777, 779-82 (5th Cir. 1995) (holding

---

[10]The court addresses below Moore's claims for age and race discrimination based on the denial of a promotion to the Team Lead position.

that refusal to allow employee to attend training sessions did not constitute adverse employment action).

And even if this court were inclined to hold, as Moore contends, that denial of training can constitute an adverse employment action when lack of training results in denial of a promotion, Moore has failed to produce any evidence that would enable a reasonable jury to find that she was denied a promotion to the position of Team Lead based on her lack of training. The only supporting evidence she cites is her own affidavit,[11] in which she avers:

> Carillo had told me that he would train me on what I needed to be a team lead. . . . He then trained Wyatt Wolf (white male – under 40) and Anthony Vogel (white male – under 40) to do the processes he refused to show me. . . . Anthony was subsequently hired for the position I was seeking, even though he had issues with others in the department.

P. Ex. 1 at 2.[12] These conclusory assertions are insufficient to enable a reasonable jury to find that the reason Vogel was chosen over Moore for the position of Team Lead was because Vogel had received training that Moore had been denied.

Accordingly, because Moore has failed on two grounds to establish a prima facie case

---

[11]Capital One moves to strike Moore's affidavit on the ground that it is "replete with hearsay, conclusory statements, unsupported legal conclusions, contradictions to prior sworn testimony, and statements lacking personal knowledge, foundation, or relevance." D. Mot. Strike 1. It moves to strike the affidavits of Janeeka Shaver and Starsha Smith for many of the same reasons. Because the court is deciding the present motion for summary judgment in Capital One's favor, it denies Capital One's motions to strike as moot.

[12]As explained above, *see supra* § II, Moore's appendix does not comply with the requirements of N.D. Tex. Local Rule 56.6(b)(3), which requires that each page of the appendix must be sequentially numbered. Accordingly, the court will refer to citations in Moore's appendix by exhibit number.

of age or race discrimination claim based on denial of training—either because it does not constitute an adverse employment action or because Moore has failed to present sufficient evidence for a reasonable jury to find that Vogel was chosen over Moore for the position of Team Lead because Vogel had received training that Moore had been denied—the court grants Capital One's motion for summary judgment on Moore's age and race discrimination claims based on the denial of training.

## VI

Moore also alleges claims for age and race discrimination based on Capital One's failure to promote her to the position of Team Lead in October 2012.

## A

Capital One moves for summary judgment dismissing Moore's promotion claim on the ground that she cannot establish a prima facie case of discrimination because there is no evidence that she was qualified for the position of Team Lead. Moore responds that she was qualified, and she cites in support her own affidavit and the affidavits of two of her coworkers. Because the court holds below that this claim fails at the third step of the burden-shifting framework—because Moore has not produced sufficient evidence for a reasonable jury to find pretext—the court will assume *arguendo* that Moore has established a prima facie case of race and age discrimination under Title VII, the ADEA, and the TCHRA.

## B

Turning to the second step, Capital One must produce evidence of a legitimate, nondiscriminatory reason for failing to promote Moore to position of Team Lead in 2012.

Capital One has introduced evidence that it selected Vogel over Moore because Vogel was more qualified. Capital One maintains that, compared to Moore, whose performance was evaluated in 2012 as "inconsistent," Vogel's performance was evaluated as "very strong." Capital One also posits that unlike Moore, Vogel knew all of the processes in the Vault Department, consistently demonstrated above-satisfactory performance, assisted with training new associates, performed complex tasks, such as conducting research for audits, and was viewed as a leader by other associates in the departments. The court concludes that Capital One has met its burden of producing evidence of a legitimate, nondiscriminatory reason for not promoting Moore. *See, e.g., Clemmer v. Irving Indep. Sch. Dist.*, 2016 WL 1161784, at *12 (N.D. Tex. Mar. 22, 2016) (Fitzwater, J.) (holding that evidence that candidate selected for promotion was more qualified than plaintiff constituted legitimate, nondiscriminatory reason for not promoting plaintiff), *aff'd*, ____Fed. Appx. ____ (5th Cir. May 19, 2017).

C

1

Because Capitol One has met its burden of production, the burden now shifts back to Moore to produce evidence that would enable a reasonable jury to find that the reasons on which Capitol One relied for promoting Vogel to the Team Lead position rather than Moore are pretextual.

To establish pretext, Moore must show that Capital One's "proffered explanation is false or unworthy of credence." *Vaughn v. Woodforest Bank*, 665 F.3d 632, 637 (5th Cir. 2011) (quoting *Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir. 2003)). "If [Moore] can

successfully 'raise a genuine issue of material fact as to whether [s]he has established pretext, that will suffice to avoid summary judgment.'" *Sullivan v. Worley Catastrophe Servs., L.L.C.*, 591 Fed. Appx. 243, 247 (5th Cir. 2014) (per curiam) (quoting *Nichols v. Loral Vought Sys. Corp.*, 81 F.3d 38, 41 (5th Cir. 1996)); *Jackson*, 2006 WL 680471, at *6 ("[I]n order for [plaintiff] to survive summary judgment, [s]he must create a genuine and material fact issue regarding the ultimate question of discrimination.").

Moore attempts to demonstrate pretext on the basis that she was better qualified than Vogel for the Team Lead promotion. According to Moore:

> In the instant case, [Vogel] was no more qualified than [Moore]. There is no issue as to whether [Vogel] and [Moore] were similarly situated at the time of the promotion to team lead. [Vogel] had less communicative skills, avoided work, was rude and dismissive. However, Vogel received a promotion and never received any adverse job consequences. In fact, as of the date of the filing of [Capital One]'s response, they appear to continue boasting about how exemplary they find him to be. Thus, [Moore] meets the burden of demonstrating a pretext for discrimination in the failure to promote.

P. Br. 14-15 (citations omitted). Moore also maintains that

> [t]here is no question that a different standard was applied to [Vogel] than to [Moore]. Attached statements of two employees working in the department provide evidence of their direct interactions with Vogel. They also testify regarding the favoritism of [Dzhavadova] towards Vogel and animus towards Moore based on race and age. This is sufficient evidence of a pretext for discrimination to preclude summary judgment.

*Id.* at 15.

The court concludes that Moore's evidence is insufficient to create a genuine issue of material fact on the element of pretext. "[A] showing that the unsuccessful employee was *clearly better qualified* is enough to prove that the employer's proffered reasons are pretextual." *Price v. Fed. Express Corp.*, 283 F.3d 715, 723 (5th Cir. 2002) (emphasis added; citations omitted); *see also Campbell*, 656 Fed. Appx. at 716 ("We have recognized that, in some situations, '[a] fact finder can infer pretext if it finds that the employee was "clearly better qualified" (as opposed to merely better or as qualified) than the employees who are selected.'" (quoting *EEOC v. La. Office of Cmty. Servs.*, 47 F.3d 1438, 1444 (5th Cir. 1995))). But a mere "[s]howing that two candidates are similarly qualified does not establish pretext under this standard." *Price*, 283 F.3d at 723. To create a genuine issue of material fact on the question whether she was "clearly better qualified" than Vogel, Moore was required to present evidence "from which a jury could conclude that 'no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question.'" *Moss v. BMC Software, Inc.*, 610 F.3d 917, 923 (5th Cir. 2010) (quoting *Deines v. Tex. Dep't of Protective & Regulatory Servs.*, 164 F.3d 277, 280-81 (5th Cir. 1999)).

Moore's self-serving affidavit and the affidavits of two coworkers—neither of whom was involved in the decision to promote Vogel over Moore to the position of Team

Lead[13]—are insufficient to create a genuine issue of material fact regarding whether Moore was clearly better qualified for the position than Vogel. In her affidavit, Moore avers that she had been at the company longer than Vogel; that her production numbers were better than Vogel's; that in 2011 Vogel was transferred from the Vault Department to the Title Department, but Vogel "lasted [over] there not even one day," P. Ex. 1 at 3; that Moore had received the Ruby Sapphire 9 out of 12 times in 2012; and that Vogel had numerous production issues and avoided doing his own work. Even accepting these statements as true and drawing all reasonable inferences in Moore's favor, as the summary judgment nonmovant, Moore has not provided the kind of apples-to-apples comparison that would enable a reasonable jury to conclude that Moore was clearly better qualified for the Team Lead position than Vogel. For example, Moore contends that she had received the Ruby Sapphire 9 times out of 12 in 2012, but she provides no information on what the Ruby Sapphire signifies or whether Vogel had received similar recognition for his work during that year. Nor does Moore explain why any of the positive attributes she identifies in her affidavit would make her a better choice—much less a "clearly better qualified" candidate—for the Team Lead position than Vogel.[14] And although Moore avers in her

_____

[13]Moore does not dispute that Cornejo and Stanaland made the decision to promote Vogel to the position of Team Lead in October 2012.

[14]Moore also states in her response:

> Assuming: (1) Defendant actually had a 98% error free requirement for QA standards, and (2) that team leads could not make corrections before QAs, and (3) that no one had access to

affidavit that Vogel had numerous "production issues," *id.*, and avoided doing his own work, she does not provide any detail regarding Vogel's "production issues," explain how these alleged issues would impact Vogel's ability to perform in the Team Lead position, or allege that Cornejo or Stanaland—the two Capital One employees who made the decision to promote Vogel over Moore—were aware of Vogel's "production issues," or that he avoided doing his own work, when they decided to promote him to the Team Lead position.

Even if Moore's summary judgment evidence were sufficient to create a fact issue on the question whether Moore was clearly better qualified for the Team Lead position, under the *McDonnell Douglas* burden-shifting framework, "[t]he ultimate question is whether the employer intentionally discriminated." *Reeves*, 530 U.S. at 146. "In other words, '[i]t is not enough . . . to *dis*believe the employer; the factfinder must *believe* the plaintiff's explanation of intentional discrimination.'" *Id.* at 147 (alterations in original) (quoting *St. Mary's Honor Ctr.*, 509 U.S. at 519). Here, Moore has failed to point to any evidence from which a reasonable jury could find that Cornejo or Stanaland intentionally discriminated against Moore based on her age or her race. Accordingly, the court grants Capital One's motion for summary judgment on Moore's discrimination claims based on Capital One's failure to

> change any computer files; Plaintiff still precludes summary judgment by showing that race and/or age were factors in making the determinations of lack of training, failure to promote and termination.

P. Br. 15-16. This conclusory allegation, without any citation to evidence in the summary judgment record, is insufficient to create a genuine issue of material fact on a mixed-motives theory for Moore's Title VII or TCHRA claims.

promote her to the Team Lead position.

## VII

Capital One moves for summary judgment on Moore's termination-based discrimination claims under Title VII, the ADEA, or the TCHRA on the ground that Moore failed to exhaust her administrative remedies.

## A

"It is well settled that courts may not entertain claims brought under Title VII as to which an aggrieved party has not first exhausted his administrative remedies by filing a charge of discrimination with the EEOC." *Kretchmer v. Eveden, Inc.*, 2009 WL 854719, at *3 (N.D. Tex. Mar. 31, 2009) (Fitzwater, C.J.) (citing *Taylor v. Books A Million, Inc.*, 296 F.3d 376, 378-79 (5th Cir. 2002); *Bernard v. ATC VanCom*, 2005 WL 139110, at *2 (N.D. Tex. Jan. 20, 2005) (Fitzwater, J.)), *aff'd*, 374 Fed. Appx. 493 (5th Cir. 2010). "Exhaustion occurs when the plaintiff files a timely charge with the EEOC and receives a statutory notice of right to sue." *Taylor*, 296 F.3d at 378-79. "This requirement serves the dual purposes of affording the EEOC and the employer an opportunity to settle the dispute through conciliation, and giving the employer some warning as to the conduct about which the employee is aggrieved." *Hayes v. MBNA Tech., Inc.*, 2004 WL 1283965, at *3 (N.D. Tex. June 9, 2004) (Fitzwater, J.) (citing *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 44 (1974); *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455, 466 (5th Cir. 1970)).

"The lawsuit that follows [a timely charge with the EEOC] is limited in scope to the EEOC investigation that could reasonably be expected to grow out of the charge of

discrimination." *Id.* (citing *Young v. City of Houston, Tex.*, 906 F.2d 177, 179 (5th Cir. 1990)). "In other words, the complaint may encompass any kind of discrimination 'like or related to' allegations contained in the EEOC charge." *Id.* (quoting *Sanchez*, 431 F.2d at 466). This test strikes a balance between two competing Title VII policies.

> On the one hand, because the provisions of Title VII were not designed for the sophisticated, and because most complaints are initiated pro se, the scope of an EEOC complaint should be construed liberally. On the other hand, a primary purpose of Title VII is to trigger the investigatory and conciliatory procedures of the EEOC, in [an] attempt to achieve non-judicial resolution of employment discrimination claims. Indeed, a less exacting rule would also circumvent the statutory scheme, since Title VII clearly contemplates that no issue will be the subject of a civil action until the EEOC has first had the opportunity to attempt to obtain voluntary compliance.

*Pacheco v. Mineta*, 448 F.3d 783, 788-89 (5th Cir. 2006) (internal quotation marks, citations, emphasis, and brackets omitted).

"The exhaustion of administrative remedies requirement under the ADEA is nearly identical to that of Title VII." *Evenson v. Sprint/United Mgmt. Co.*, 2008 WL 4107524, at *6 (N.D. Tex. Aug. 21, 2008) (Fitzwater, C.J.) (citing 42 U.S.C. § 2000e-5; 29 U.S.C. § 626). "As with Title VII, the filing of a charge sets in motion the ADEA's administrative remedies, triggering the EEOC's duty to promptly notify the complainant's employer to facilitate informal methods of conciliation." *Id.* (citing § 2000e-5(b); § 626(d)).

And "[b]efore suing an employer under the TCHRA, an aggrieved employee must first exhaust his administrative remedies by filing a complaint with the [Texas Workforce Commission] 'not later than the 180th day after the date the alleged unlawful employment

practice occurred.'" *Black v. Dall. Cnty. Cmty. Coll. Dist.*, 2017 WL 395695, at *2 (N.D. Tex. Jan. 30, 2017) (Fitzwater, J.) (citing Tex. Lab. Code Ann. § 21.202(a); *Schroeder v. Tex. Iron Works, Inc.*, 813 S.W.2d 483, 486 (Tex. 1991), *overruled on other grounds by In re United Servs. Auto. Ass'n*, 307 S.W.3d 299 (Tex. 2010)).

B

Moore filed her EEOC Charge on February 22, 2013, alleging that she had been discriminated against by being denied training opportunities and being passed over for a promotion, and that she had been retaliated against by being given a poor performance review after she reported the alleged discrimination. The EEOC dismissed Moore's charge and issued her a right-to-sue letter on April 15, 2014. Moore's employment with Capital One was terminated on June 3, 2014, more than fifteen months after Moore filed, and almost two months after the EEOC dismissed, the EEOC Charge. Moore neither filed a supplemental charge nor amended her charge to complain about her termination.

Capital One moves for summary judgment on Moore's discrimination claims based on her June 3, 2014 termination[15] on the ground that Moore failed to exhaust her administrative remedies related to her termination. Capital One contends that once the

---

[15]Moore appears to allege the following claims based on her June 3, 2014 termination: discrimination and retaliation, in violation of Title VII, the ADEA, and the TCHRA. Capital One moves for summary judgment on the basis of failure to exhaust administrative remedies, however, only with respect to Moore's Title VII, ADEA, and TCHRA *discrimination* claims. *See* D. Br. 30 ("Plaintiff cannot establish a claim for race or age discrimination based on her termination as a matter of law because she failed to exhaust her administrative remedies to be able to assert the claims).

EEOC dismissed Moore's EEOC Charge on April 15, 2014, no actions occurring thereafter—such as her termination—could have been investigated by the EEOC as a result of the EEOC Charge, and that Moore cannot establish a claim for race or age discrimination based on her termination as a matter of law because she failed to exhaust her administrative remedies as to these claims. Moore responds that "the *retaliation* was continuing and that the termination is part of that *retaliation*." P. Br. 9 (emphasis added) (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002)).

C

In *Morgan* the Supreme Court held that "[a] discrete retaliatory or discriminatory act 'occurred[,]'" for purposes of Title VII's exhaustion requirement,[16] "on the day that it 'happened,'" and that "[a] party, therefore, must file a charge within either 180 or 300 days of the date of the act or lose the ability to recover for it." *Morgan*, 536 U.S. at 110; *see also id.* at 113 ("discrete discriminatory acts [such as termination] are not actionable if time barred, even when they are related to acts alleged in timely filed charges."). Although the Court announced a different rule for hostile work environment claims—they are "different in kind from discrete acts [since] [t]heir very nature involves repeated conduct," *id.* at 115—Moore has not alleged a hostile work environment claim. And in her response brief, she does not appear to contend that she has timely exhausted a *discrimination* claim (to the

---

[16]42 U.S.C. § 2000e-5(e)(1) provides that "[a] charge under this section shall be filed within one hundred and eighty days after the alleged unlawful employment practice occurred."

extent she even intended to bring such a claim) based on her termination. *See* P. Br. 9 ("the *retaliation* was continuing and . . . the termination is part of that *retaliation*." (emphasis added)). Nor could she. She filed her single charge with the EEOC over fifteen months before her termination. Accordingly, to the extent Moore alleges a termination-based Title VII, ADEA, or TCHRA discrimination claim, the court grants Capital One's motion for summary judgment on the basis that Moore failed to timely exhaust her administrative remedies.

## VIII

The court now turns to Moore's retaliation claims.

## A

Title VII, the ADEA, and the TCHRA each prohibit an employer from retaliating against an employee who engages in a protected activity. *See* 42 U.S.C. § 2000e-3(a); 29 U.S.C. § 623(d); Tex. Lab. Code Ann. § 21.055 (West 2015). Because Moore relies on circumstantial evidence to support her retaliation claims, as with her discrimination claims, she must proceed under the *McDonnell Douglas* burden-shifting analysis. *See, e.g., Royal v. CCC & R Tres Arboles, L.L.C.*, 736 F.3d 396, 400 (5th Cir. 2013) ("A retaliation claim that is premised on a pretextual rationale for dismissal is analyzed under the *McDonnell Douglas* framework.").

Moore must demonstrate a prima facie case of retaliation by showing that (1) she engaged in a protected activity, (2) an adverse employment action occurred, and (3) a causal link existed between the protected activity and the adverse employment action. *See, e.g.,*

-31-

*Walker v. Norris Cylinder Co.*, 2005 WL 2278080, at *9 (N.D. Tex. Sept. 19, 2005) (Fitzwater, J.) (citing *Long v. Eastfield Coll.*, 88 F.3d 300, 304 (5th Cir. 1996)). The burden then shifts to Capital One to articulate a legitimate, nonretaliatory reason for the allegedly retaliatory action taken. If Capital One meets its production burden, the burden shifts back to Moore to produce evidence that would enable a reasonable jury to find that retaliation for Moore's protected conduct, rather than Capital One's proffered legitimate, nonretaliatory reason, was the "but-for cause" of the adverse employment action. *See Univ. of Tex. Sw. Med. Ctr. v. Nassar*, ____ U.S. ___, 133 S.Ct. 2517, 2528 (2013) ("Title VII retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action."); *Pineda v. United Parcel Serv., Inc.*, 360 F.3d 483, 488 (5th Cir. 2004) ("[I]n [TCHRA] retaliation cases where the defendant has proffered a nondiscriminatory purpose for the adverse employment action the plaintiff has the burden of proving that 'but for' the discriminatory purpose he would not have been terminated."); *Sherrod v. Am. Airlines, Inc.*, 132 F.3d 1112, 1122 (5th Cir. 1998) (stating, in ADEA case, that "[t]he ultimate issue of retaliation requires the employee to prove that the adverse employment action would not have occurred 'but-for' the protected activity.").

B

To the extent Moore bases her retaliation claims on conduct that predated her January 2013 complaint to Stanaland and the Associate Relations Department ("January 2013 Complaint"), or conduct that was in retaliation for an activity that is not protected by Title VII, the ADEA, or the TCHRA, the court grants Capital One's motion for summary

judgment on these claims.

In her complaint, Moore alleges that she was "deni[ed] training and promotion . . . out of retaliation against Plaintiff," Compl. ¶ 11. Capital One moves for summary judgement on this claim, contending, *inter alia*, that Moore cannot establish a causal connection between any protected activity and the denial of Team Lead training because she was denied Team Lead training *before* she filed the January 2013 Complaint. In response, Moore fails to adduce any contrary evidence. As a matter of law, Capital One could not have retaliated against Moore on the basis of the January 2013 Complaint because the allegedly retaliatory conduct (i.e., the denial of training and the failure to promote) occurred prior to the protected activity (i.e., the January 2013 Complaint). And because Moore has failed to produce evidence that would enable a reasonable jury to find that "but for" the January 2013 Complaint or some other protected activity, Moore would have been given Team Lead training and/or a promotion to the position of Team Lead in October 2012, the court grants Capital One's motion for summary judgment on Moore's retaliation claims based on this allegation.

Moore also alleges that "[a]bout one week after reporting discrimination to the human resources department, [she] was given a poor performance review out of retaliation for her report to human resources." Compl. ¶ 14. Capital One moves for summary judgment on this basis for Moore's retaliation claim on the ground, *inter alia*, that even if Moore's 2012 performance review constituted an adverse employment action, she still cannot show causation between the rating she received on the review and her January 2013 Complaint

because it is undisputed that Cornejo completed and submitted the review before December 20, 2012, which was *before* Moore initiated her January 2013 Complaint. Moore has not responded to this argument. Nor does she dispute that Cornejo completed and submitted Moore's 2012 performance review before she initiated the January 2013 Complaint. And because the January 2013 Complaint is the only protected activity Moore alleges she engaged in, she cannot establish a causal link between the January 2013 Complaint and her 2012 performance review as a matter of law. Accordingly, Capital One is entitled to summary judgment dismissing Moore's retaliation claim based on her 2012 performance review.

Finally, to the extent Moore contends that Cornejo treated her "harshly" during a meeting in retaliation for Moore's reporting his QA error years earlier, Capital One argues that "reporting Cornejo's alleged error in auditing her work [did not] constitut[e] a protected activity under Title VII, the ADEA, or the [TCHRA] because it had nothing to do with her race or age." D. Br. 44. The court agrees. And because Moore has not adduced evidence of any other protected activity for which Cornejo allegedly retaliated against her, the court grants Capital One's motion for summary judgment on Moore's retaliation claim based on Cornejo's harsh treatment of her during a meeting.

C

The court now turns to Moore's retaliation claims based on her termination. Moore participated in a protected activity when she complained to Stanaland and Capital One's Associate Relations Department that she felt she had been denied training and a promotion to the position of Team Lead because she was African-American and older. Moore was

subjected to an adverse employment action when she was terminated. Capital One contends that Moore cannot establish a prima facie case of retaliation because, first, the decision to terminate her employment was made by Gandara and Craig, both of whom were unaware of Moore's January 2013 Complaint, and, second, the extended period of time between the January 2013 Complaint and Moore's termination (approximately 15 months) is too attenuated to establish the causal connection necessary for a retaliation claim. Moore responds that her team lead, Dzhavadova, knew about the January 2013 Complaint, and that "[b]y establishing that the team leads can correct the work without affecting the QAs raises a question as to the validity of the assessments." P. Br. 13.

Because the causal link requirement of a prima facie case is minimal,[17] the court will assume *arguendo* that Moore has satisfied it. Even so, she has not met her burden of introducing evidence that would enable a reasonable trier of fact to find "but for" causation at the third step of the *McDonnell Douglas* paradigm. A reasonable jury could not find that Gandara and Craig's decision to terminate Moore's employment in June 2014 was motivated

---

[17]"[T]he requirement that a plaintiff show at the prima facie case stage a 'causal link' between a protected activity and an adverse employment action is 'much less stringent' than the 'but[-]for' causation that a jury must find." *Warner v. Lear Corp.*, 2017 WL 930829, at *5 (N.D. Tex. Mar. 9, 2017) (Fitzwater, J.) (citing *Montemayor v. City of San Antonio*, 276 F.3d 687, 692 (5th Cir. 2001); *Khanna v. Park Place Motorcars of Hous., Ltd.*, 2000 WL 1801850, at *4 (N.D. Tex. Dec. 6, 2000) (Fitzwater, J.) (characterizing this prima facie case burden as "minimal")).

by Moore's complaints to Stanaland and Capital One's Associate Relations department *15 months earlier*, in January 2013. *See Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (per curiam) ("The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close.'" (citation omitted)). Moreover, Moore has not adduced evidence that creates a genuine issue of material fact regarding whether Capital One's stated reasons for her termination—poor attitude and unsatisfactory performance—were pretextual.

As a preliminary matter, Capital One contends (and Moore neither disputes nor offers contrary evidence) that the individuals who decided to terminate Moore's employment—Craig and Gandara—did not have any knowledge of Moore's January 2013 Complaint at the time they made their termination decision. "If an employer is unaware of an employee's protected conduct at the time of the adverse employment action, the employer plainly could not have retaliated against the employee based on that conduct." *Ackel v. Nat'l Comm'cns, Inc.*, 339 F.3d 376, 386 (5th Cir. 2003) (quoting *Chaney v. New Orleans Pub. Facility Mgmt., Inc.*, 179 F.3d 164, 168 (5th Cir. 1999)). Moore's response to Capital One's argument on this point is that *Dzhavadova* knew about the January 2013 Complaint. But Moore has not produce any evidence that Dzhavadova informed Gandara or Craig of Moore's January 2013 Complaint or that Dzhavadova had influence or leverage over them.[18]

_____

[18]Under a "cat's paw" theory, which the court assumes *arguendo* could apply in the context of Moore's Title VII, ADEA, and TCHRA retaliation claims, "when the person

On this basis, alone, Capital One is entitled to summary judgment.

But even assuming *arguendo* that Craig or Gandara was aware of Moore's January 2013 Complaint, Moore has still failed to show "but for" causation. In her affidavit, Moore avers that although Capital One refers to performance reviews on issues of "communication and influence,"

> [t]his has no basis, as I communicated well within my team. I assisted others and was concerned with the benefit of the company. I feel that I helped the company do well. [Whenever] I would ask what was meant by "better communication" Seth Carillo would tell me that [whoever] I had pull files, they were not putting them in order. After he would tell me that, I would go back again and tell whomever I instructed to pull files and correct them again. I would notice that they would not hold themselves to the same standard for which they were critici[z]ing me. I could tell they were just trying to come up with something to keep jobs open for their friends.

P. Ex. 1 at 2-3. But Moore's unsubstantiated opinion that she communicated well with the team is insufficient to permit a reasonable jury to find that Gandara and Craig—the Capital One employees who decided to terminate Moore's employment—did not actually believe that Moore had a poor attitude or that the "but for" cause of Moore's termination was her January 2013 Complaint.

---

conducting the final review serves as the 'cat's paw' of those who were acting from retaliatory motives, the causal link between the protected activity and adverse employment action remains intact." *Gee v. Principi*, 289 F.3d 342, 346 (5th Cir. 2002) (citing *Long*, 88 F.3d at 307). The ultimate question is whether "the employee can demonstrate that others had influence or leverage over the official decisionmaker." *Rios v. Rossotti*, 252 F.3d 375, 382 (5th Cir. 2001) (quoting *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 226 (5th Cir. 2001)).

Moreover, Moore does not dispute that, on numerous occasions, her QA monthly average scores fell below the 98% required by Capital One's "Vault Performance Expectations." Nor has she produced any evidence that she did not, in fact, commit the errors that Tingdale found. Instead, Moore contends that Capital One relied on a "flawed and subjective system of [QA] evaluations," P. Br. 11; that "[t]hese processes are flawed because the final number can easily be modified by having the person making the evaluation step into the process at numerous phases, at their sole discretion," *id.*; and that

> team leads and others have access to the computer information which logs the activity of the associates. Therefore, the information regarding who has handled a file can be changed. This was a problem for numerous employees. The changing of information impacted QAs and award recognition for temps and permanent employees alike.

*Id.*

In her affidavit, Moore states:

> The QAs mentioned at the time of my termination was based on management taking control of my work files. When we could not find things, they started claiming that if they could find it, I should have been able to find it. I had never had any type of lost issue like that as part of review. There had always been documents in the lost/missing cue and it had never been an issue. At the time I left, there were still documents in the cue related to others not me. The resulting QAs after I reported the discrimination to HR were all retaliatory and discriminatory.

P. Ex. 1 at 4. But Moore has failed to present any evidence—other than her own unsupported speculation—from which a reasonable jury could find that someone "tampered with" her QA scores in retaliation for her January 2013 Complaint. *See Brown v. City of Houston*, 337 F.3d

-38-

539, 541 (5th Cir. 2003) ("Unsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment.").

In sum, Moore has failed to create a genuine fact issue on the ultimate question of "but-for" causation. She has failed to introduce evidence that would enable a reasonable jury to find that the proffered reasons for her termination—poor attitude and unsatisfactory performance—were not the real reasons Capital One terminated her. And Moore neither contends nor has introduced evidence that she would not have been terminated "but for" her complaint to HR *15 months earlier*. In other words, based on the evidence in the summary judgment record, no reasonable jury could find that Moore's January 2013 Complaint to HR was the but-for cause of her termination.

Accordingly, the court concludes that Capital One is entitled to summary judgment dismissing Moore's retaliation claims.

\* \* \*

For the reasons explained, the court grants Capital One's motion for summary judgment, denies Capital One's motions to strike as moot, and dismisses this action with prejudice by judgment filed today.

**SO ORDERED**.

June 13, 2017.

SIDNEY A. FITZWATER
UNITED STATES DISTRICT JUDGE